DOUGLAS GILLIES, ESQ.  (CA Bar No. 53602)
douglasgillies@gmail.com
3756 Torino Drive
Santa Barbara, CA 93105
(805) 682-7033

Attorney for Plaintiff
DARYOUSH JAVAHERI

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARYOUSH JAVAHERI,<br><br>                              Plaintiff,<br><br>v.<br><br>JP MORGAN CHASE BANK N.A.,<br>and DOES 1-50, inclusive,<br>                              Defendants.<br>_____ | )  Case No. CV 10-8185-ODW (FFMx)<br>)<br>)  JUDGE:  HON. OTIS D. WRIGHT II<br>)<br>)  OPPOSITION TO DEFENDANT'S<br>)  MOTION TO DISMISS SECOND<br>)  AMENDED COMPLAINT<br>)<br>)  DATE: June 6, 2011<br>)  TIME: 1:30 PM<br>)  COURTROOM: 11<br>)  Trial Date: None Set<br>)  Action Filed: October 29, 2010<br>)<br>)<br>) |

Plaintiff DARYOUSH JAVAHERI opposes Defendant's Motion to Dismiss Plaintiff's Second Amended Complaint on the grounds that the SAC contains sufficient facts to state plausible claims for relief.

///

///

# Table of Contents

TABLE OF AUTHORITIES                                                      iii

THE FACTS                                                                  1

1. CAL CIVIL CODE §2923.5 – FIRST CAUSE OF ACTION                          9

2. WRONGFUL FORECLOSURE – SECOND CAUSE OF ACTION                          14

3. QUASI CONTRACT – THIRD CAUSE OF ACTION                                 18

4. NO CONTRACT – FOURTH CAUSE OF ACTION                                   21

5. QUIET TITLE – FIFTH CAUSE OF ACTION                                    24

6. DECLARATORY/INJUNCTIVE RELIEF – SIXTH CAUSE OF ACTION                  28

7. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS – SEVENTH
CAUSE OF ACTION                                                          28

8. CONCLUSION                                                            29

1

# TABLE OF AUTHORITIES

2

**Cases**

3

*Barker v. Riverside County Office of Education*, 584 F.3d 821, 824 (9th Cir. 2009)...........................9

4

*Burgess v. Rodom*, 121 Cal. App. 2d 71 (1953) ..................................................................23

5

*Caravantes v. California Reconveyance Co.*, 2010 WL 4055560, 9 (S.D.Cal. 2010).........................16

6

*Carpenter v. Longan*, 83 U.S. 271, 274 (1872) ................................................................18

7

*Cook v. Mielke*, 3 Cal. App. 2d 736 (1935) ......................................................................23

8

*Das v. WMC Mortgage* Corp., 2010 U.S. Dist. LEXIS 122042, 10-25 (N.D. Cal. Oct. 28, 2010)..9, 13

9

*Dillingham v. Dahlgren*, 52 Cal.App. 322, 326-327 (1921) ...................................................24

10

*Dunkin v. Boskey,* 82 Cal. App. 4th 171, 195 (2000) .........................................................19

11

*Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003)..............................29

12

*Estes v. Hardesty*, 66 Cal. App. 2d 747 (1944) ...............................................................23

13

*German Sav. & Loan Soc. v. McLellan*, 154 Cal. 710 (1908) ................................................23

14

*Gompper v. VISX, Inc.,* 298 F.3d 893, 895 (9th Cir. 2002) ....................................................9

15

*Halperin v. Raville*, 176 Cal. App. 3d 765, 774, 222 Cal. Rptr. 350 (1986) ...............................19

16

*Hirsch v. Bank of America,* 107 Cal.App.4th 708 (2003)......................................................20

17

*Holland v. McCarthy*, 173 Cal. 597 (1916) .....................................................................23

18

*Iusi v. Chase,* 169 Cal. App. 2d 83, 87, 337 P.2d 79 (1959) ...............................................19

19

*Kruse v. Bank of America*, 202 Cal.App.3d 38, 67 (1988) ...................................................29

20

*Lectrodryer v. SeoulBank,* 77 Cal.App.4th 723, 726 (2000) .................................................20

21

*Lonergan v. Scolnick*, 129 Cal. App. 2d 179 (1954)..........................................................23

22

*Mabry v. Aurora Loan Services*, 185 Cal.App.4[th] 208 (2010)..........................................9, 25

23

*Martin Deli v. Schumacher*, 52 N.Y.2d 105, 109, 436 N.Y.S.2d 247, 417 N.E.2d 541 (1981) ...........24

24

*Melchior v. New Line Productions*, 106 Cal.App.4th 779 (2003) ..........................................20

25

*MERSCORP, Inc. v. Romaine*, 861 N.E. 2d 81 (N.Y. 2006)................................................16

26

*Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990)...........................29

27

*Morton v. Foss,* 48 Cal. App. 2d 117 (1941) ....................................................................23

28

*North Star Int'l v. Arizona Corp. Comm'n,* 720 F.2d 578, 581 (9th Cir. 1983) ............................9

*Patterson v. Clifford F. Reid, Inc.*, 132 Cal. App. 454 (1933)...........................................23

*Salomon v. Cooper*, 98 Cal.App.2d 521, 522-523 (1950) ...................................................24

*Santa Clara County v. Robbiano,* 180 Cal. App. 2d 845, 848, 5 Cal. Rptr. 19 (1960) .......19

*Santens v. Los Angeles Finance Co.*, 91 Cal.Ap.2d 197, 201 (1949) .................................27

*Saxon Mortgage v. Hillery*, Case No. C-08-4357 (N.D. Cal. 2008).....................................17

*Scott v. Los Angeles Mountain Park Co.*, 92 Cal. App. 258 (1928) .....................................23

*Trerice v. Blue Cross,* 209 Cal.App3d 878 (1989) ..............................................................28

*Ussery v. Jackson*, 78 Cal. App. 2d 355 (1947).................................................................23

*Walleri v. Fed. Home Loan Bank of Seattle*, 83 F.3d 1575, 1580 (9th Cir. 1996) ................9

*Wells Fargo v. Jordan*, 914 N.E.2d 204 (Ohio 2009)..........................................................16

## **Statutes**

Cal. Civ. Code §1428 ...........................................................................................................25

Cal. Civ. Code §2920............................................................................................................1

Cal. Civ. Code §2920(a) ......................................................................................................25

Cal. Civ. Code §2923.5 ........................................................................................................13

Cal. Civ. Code §2923.5(g) ...................................................................................................12

Cal. Civ. Code §2924............................................................................................................25

Cal. Civ. Code §2934............................................................................................................26

Cal. Civ. Code §2934a..........................................................................................................27

## **Other Authorities**

*CEB Mortgages, Deeds of Trust, and Foreclosure Litigation*, (4th ed. 2011) .....................11

Congressional Oversight Panel November Oversight Report, *Examining the Consequences of Mortgage Irregularities for Financial Stability and Foreclosure Mitigation* (November 16, 2010)7

David Horton, "The Shadow Terms: Contract Procedure and Unilateral Amendments," 57 UCLA Law Review 605 (February, 2010) ...........................................................................24

*Wall Street and the Financial Crisis - Anatomy of a Financial Collapse,* the U.S. Senate Permanent

Subcommittee on Investigations (April 13, 2011) ................................................................14, 23

William Hubbard, "Efficient Definition and Communication of Patent Rights: the Importance of Ex

Post, Santa Clara Computer and High Technology Law Journal (January, 2009)..........................24

# MEMORANDUM OF POINTS AND AUTHORITIES

## THE FACTS

The facts recited in Plaintiff's Second Amended Complaint ("SAC") show that Chase is not the Lender. Only the Lender can invoke the power of sale under paragraph 22 of the Deed of Trust (Exhibit 4).

 If Chase is not the Lender, Chase has no right to initiate foreclosure under paragraph 22 of the Deed of Trust unless it can show that it is acting as an authorized agent of the Lender, and this they must prove. According to Cal. Civ. Code §2920, a mortgage is a contract. The contract is the controlling authority. The Civil Code does not invalidate the Deed of Trust so that anybody can take a home.

Chase asserts on the first page of its Memorandum of Points & Authorities that the SAC "fails primarily because JPMorgan Chase is not the same entity as Washington Mutual Bank." Plaintiff does not make such an allegation, but that is actually a primary reason that the SAC succeeds. Chase is not WaMu. Chase does not have privity with Plaintiff. Chase is a third party purchaser of certain assets. Plaintiff alleges that WaMu was not the Lender in September 2008, so Chase did not become the Lender when it assumed certain assets and liabilities of WaMu.

Contrary to defendants' assertion, the SAC does not allege that Chase acquired Plaintiff's loan from the FDIC. The SAC states that Chase asserted that it acquired certain assets, and Plaintiff relied on Chase's assertion when he made payments to Chase. Paragraph 41 of the SAC states: "Chase demanded monthly mortgage payments from Plaintiff starting in October 2008, and continued to collect payments from Plaintiff for twelve months. Plaintiff reasonably relied upon Chase's assertion that it was entitled to payments for the reason that it had acquired certain assets from WaMu under an agreement with the FDIC." Now Plaintiff wants his money back, since Chase is not the Lender and apparently was keeping his payments.

Plaintiff does not seek to rescind his loan. He seeks to ascertain the identity of

1  the Lender, if indeed the court rules or a jury finds that he entered into a contract
2  with WaMu.

3       Defendants argue that the SAC does not deny that Plaintiff is in arrears in a
4  certain amount. Denials are customary in Answers rather than Complaints. Plaintiff
5  cannot know if the amount generated by Defendant in its memorandum has any
6  basis in fact until discovery commences. It is a figure posed by Defendant as it seeks
7  to take Plaintiff's property with no substantiation.

8       Plaintiff alleges plainly and unequivocally that Chase is not the Lender, and
9  therefore Chase cannot foreclose according to the express terms of the Deed of Trust
10 and the Promissory Note. This is not a legal conclusion. Taking something that isn't
11 yours is stealing. Chase is not the Lender, a fact that is alleged in the SAC. When a
12 plaintiff alleges that defendant is attempting to take plaintiff's property, the courts
13 provide a forum for the plaintiff to challenge the thief and get the property back, or
14 otherwise be compensated. In recent years, banks got into the business of taking
15 property without offering valid documentary evidence to support their claims.  If
16 documents can prove that Chase is the Lender and that WaMu was the Lender on
17 September 25, 2008, those documents are in Chase's possession and can be
18 disclosed. Chase holds its cards tight, but that won't gain it clear title.

19      Plaintiff alleges in ¶ 14 of the SAC specifically that between November 15 and
20 November 30, 2007, WaMu transferred Plaintiff's Note to Washington Mutual
21 Mortgage Securities Corporation. The Note was then sold to an investment trust and
22 became a part of, or was subject to a Loan Pool, a Pooling and Servicing Agreement,
23 a Collateralized Debt Obligation, a Mortgage-Backed Security, a Mortgage Pass-
24 Through Certificate, a Credit Default Swap, an Investment Trust, and/or a Special
25 Purpose Vehicle. The security that started as Plaintiff's Note is listed in Standard &
26 Poor's registry as CUSIP # 31379XQC2, Pool Number 432551. Thereafter, WaMu
27 acted solely as a servicer of the loan, and was neither a Lender nor Beneficiary after
28 November 2007. These are facts, not legal conclusions.

The acronym CUSIP refers to the Committee on Uniform Security Identification Procedures, which was founded in 1964. The 9-character alphanumeric code identifies any North American security for the purposes of facilitating clearing and settlement of trades. The CUSIP distribution system is owned by the American Bankers Association and is operated by Standard & Poor's. The CUSIP Service Bureau acts as the National Numbering Association (NNA) for North America, and the CUSIP number serves as the National Securities Identification Number for products issued from both the United States and Canada. Plaintiff's Note could not have been assigned a CUSIP number unless and until it was converted into a security. Of course, these are matters readily ascertainable at trial.

Chase's counsel appears before this Court as a handwriting expert to testify to the authenticity of the diverse signatures of "Deborah Brignac." Chase's P&A offers testimony describing office practices of California Reconveyance Company. The many varied signatures attached to the SAC "clearly have initials of someone other than Ms. Brignac after the signature – indicating that there was no actual forgery involved, but rather as clearly indicated…" (Defendant's P&A 6:6-8). Mr. Jett may make a fine witness at a later stage in the proceedings, but Plaintiff objects to the testimony and expert opinions offered in Defendants' Motion to Dismiss—lacks foundation, and isn't all that clear. There was a time when banks expressed concern about forged documents. Now, when Plaintiff calls attention to a series of fake signatures, Chase calls it "an obvious last ditch effort to salvage his claims" (P&A 5:25). Times have changed.

Plaintiff's factual allegations are not far-fetched. Last month, U.S. regulators slapped the nation's largest banks with unprecedented penalties for improper home-foreclosure practices, issuing detailed orders to revamp the way they deal with troubled borrowers. The orders were issued on April 13, 2011, to Chase and thirteen other financial institutions by the Federal Reserve, the Office of Thrift Supervision (OTS), and the Comptroller of the Currency.

Under the Consent Order, Chase has sixty days to establish plans to clean up its mortgage-servicing processes to prevent documentation errors. The Order directs Chase to take steps to ensure it has enough staff to handle the flood of foreclosures, that foreclosures don't happen when a borrower is receiving a loan modification, and that borrowers have a single point of contact throughout the loan-modification and foreclosure process.

Chase must hire an independent consultant to conduct a "look back" of all foreclosure proceedings from 2009 and 2010, including Plaintiff's foreclosure, to evaluate whether Chase improperly foreclosed on any homeowners. Chase must establish a process to consider whether to compensate borrowers who have been harmed. The Federal Reserve has ordered Chase and other big banks to clean up their illegal foreclosure practices. This is the context in which Plaintiff filed suit.

The *New York Times* reported on April 14, 2011:

> Regulators said the enforcement actions were tough measures that would make the banks accountable. "The banks are going to have to do substantial work, bear substantial expense, to fix the problem," the Acting Comptroller of the Currency, John Walsh, told reporters in a conference call.

> JPMorgan Chase, one of the servicers signing the agreement, said that it was adding as many as 3,000 employees to meet the new regulatory demands. Jamie Dimon, its chief executive, called it "a lot of intensive manpower and talent to fix the problems of the past."

> — http://www.nytimes.com/2011/04/14/business/14foreclose.html

Chase signed the Consent Order with the Board of Governors of the Federal Reserve System on April 13, 2011. Plaintiff requests that the court take judicial notice of the Federal Reserve Consent Order, BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM Docket No. 11-023-B-HC, attached as Exhibit 15, which is summarized below and is available for download on the Fed's website at: www.federalreserve.gov/newsevents/press/enforcement/enf20110413a5.pdf

Plaintiff's Opposition to Motion to Dismiss Second Amended Complaint

1    The Consent Order, signed by Frank Bisignano, Chief Administrative Officer of

2    Chase, includes the following allegations against Chase, which, according to the

3    Order, initiated more than a quarter of a million foreclosure actions in 2009-2010.

4    The Consent Order has been abbreviated (but not changed) in the following:

5    WHEREAS, in connection with the process leading to certain foreclosures

6    involving the Servicing Portfolio, the Mortgage Servicing Companies (Chase) allegedly:

7    (a) Filed or caused to be filed in state courts and in connection with

8    bankruptcy proceedings in federal courts numerous affidavits executed by

9    employees making various assertions, such as the ownership of the mortgage

10   note and mortgage, the amount of principal and interest due, and the fees and expenses chargeable to the borrower, in which the affiant represented that the

11   assertions in the affidavit were made based on personal knowledge or based on

12   a review by the affiant of the relevant books and records, when, in many cases, they were not based on such knowledge or review;

13   (b) Filed or caused to be filed in state courts, in federal courts or in the local

14   land record offices, numerous affidavits and other mortgage-related documents that were not properly notarized, including those not signed or affirmed in the

15   presence of a notary;

16   (c) Litigated foreclosure and bankruptcy proceedings and initiated non-

17   judicial foreclosures without always confirming that documentation of

18   ownership was in order at the appropriate time, including confirming that the promissory note and mortgage document were properly endorsed or assigned and, if necessary, in the possession of the appropriate party;

19

20   WHEREAS, the practices set forth above allegedly constitute unsafe or

21   unsound banking practices;

22   NOW, THEREFORE, Chase shall cease and desist and take affirmative

23   action, as follows …

24   The forged signatures of Deborah Brignac, attached to the SAC as Exhibits 8

25   and 10-14 and included in ¶ 37 of the SAC, fit into a national pattern that prompted

26   the Federal Reserve to impose a Consent Order on our nation's biggest banks,

27   including Chase. Defendants' Motion to Dismiss protests that the forgeries have

28   nothing to do with Plaintiff's loan. Only the trier of fact can determine whether the

very different signatures of Deborah Brignac on the Substitution of Trustee (Exhibit 8), the Notice of Trustee's Sale (Exhibit 10), and countless other recorded documents were truly signed by Ms. Brignac based on her personal knowledge. If the signature on the Substitution of Trustee is a forgery, the foreclosure is illegal. CRC cannot become the Trustee based on the forged signature of its own employee.

Defendants assert that calling attention to a forged Substitution of Trustee is a "last ditch effort" by Plaintiff. The banks dug plenty of ditches, and the Fed is not taking them lightly. Defendants may seek to place a cloud on Plaintiff's title by gaining a dismissal on the pleadings and then conducting an illegal foreclosure sale, but the cloud will not go away so easily.

The presumption of infallibility where big banks are concerned no longer applies. Chase and other banks have adopted a nationwide strategy of defeating homeowners in foreclosure on the basis of challenging the language of the complaints. While possessing all the evidence, the banks stonewall plaintiffs in court and then presume they can take whatever property they fancy. This is a shortsighted and self-destructive legal strategy that will lead to endless litigation and result in a cascading plunge in real property values for decades in the United States.

A judgment resulting from dismissal based on alleged defects in the complaint does not resolve the underlying issue as to who owns the property. A demurrer or dismissal is no more that an editorial rebuke of the draftsman when it concerns title to real property. If the bank gets a judgment, sells the property, takes the money, and pays another billion-dollar round of bonuses to its executives, the unlucky buyer of REO or Deed Upon Trustee's Sale will not get clear title. New facts and new theories will support an endless succession of lawsuits as holders of grant deeds, such as Plaintiff Daryoush Javaheri, their successors and assigns, hammer away at the mountain of securitization documents that will continue to percolate to the surface in lawsuits for years to come. Better to get it out in the open now, rather than plow these controversies under a rising pile of toxic title defects that will be passed back

1  and forth between banks, title companies, and the holders of grant deeds. It's a big

2  mess now, but it will only get bigger the longer it is perpetuated.

3  This may seem like the bold pronouncement of some lawyer fighting to save

4  his client's family home, but it is a finding of the Congressional Oversight Panel, a

5  body convened by Congress to keep an eye on the initial $700-billion bailout.[1]

6  Plaintiff renews his Request for Judicial Notice of the Congressional Oversight

7  Panel (COP) Report, *Examining the Consequences of Mortgage Irregularities for*

8  *Financial Stability and Foreclosure Mitigation* (November 16, 2010). The COP

9  report is attached to Plaintiff's current Request for Judicial Notice as Exhibit "15." It

10  states on pages 4-8:

11  In the fall of 2010, reports began to surface alleging that companies

12  servicing $6.4 trillion in American mortgages may have bypassed legally

13  required steps to foreclose on a home. Employees or contractors of Bank of

14  America, GMAC Mortgage, and other major loan servicers testified that they

15  signed, and in some cases backdated, thousands of documents claiming

16  personal knowledge of facts about mortgages that they did not actually know

17  to be true.

18  Allegations of "robo-signing" are deeply disturbing and have given rise to

19  ongoing federal and state investigations. At this point the ultimate

20  implications remain unclear. It is possible, however, that "robo-signing" may

21  have concealed much deeper problems in the mortgage market that could

22  potentially threaten financial stability and undermine the government's efforts

23

24  [1] In response to the escalating financial crisis, on October 3, 2008, Congress provided Treasury

25  with the authority to spend $700 billion to stabilize the U.S. economy, preserve home ownership,

26  and promote economic growth. Congress created the Office of Financial Stability (OFS) within

     Treasury to implement the TARP. At the same time, Congress created the Congressional Oversight

27  Panel to "review the current state of financial markets and the regulatory system." The Panel is

     empowered to hold hearings, review official data, and write reports on actions taken by Treasury

28  and financial institutions and their effect on the economy (COP Report, Nov. 16, 2010, p. 124)

to mitigate the foreclosure crisis.

If documentation problems prove to be pervasive and, more importantly, throw into doubt the ownership of not only foreclosed properties but also pooled mortgages, the consequences could be severe. Clear and uncontested property rights are the foundation of the housing market. If these rights fall into question, that foundation could collapse. Borrowers may be unable to determine whether they are sending their monthly payments to the right people (COP Report, Nov. 16, 2010, pp. 4-5).

If irregularities in the foreclosure process reflect deeper failures to document properly changes of ownership as mortgage loans were securitized, then it is possible that Treasury is dealing with the wrong parties in the course of the Home Affordable Modification Program (HAMP). This could mean that borrowers either received or were denied modifications improperly. Some servicers dealing with Treasury may have no legal right to initiate foreclosures, which may call into question their ability to grant modifications or to demand payments from homeowners, whether they are part of a foreclosure mitigation program or otherwise. The servicers' tendency to cut corners may also have affected the determination to modify or foreclose upon individual loans.

Many of the entities implicated in the recent document irregularities, including Ally Financial, Bank of America, and **JPMorgan Chase**, are current or former TARP recipients (p. 8) (emphasis added).

Chase wants to take real property without offering any real proof that will tend to show who is the Lender or who holds a beneficial interest in the promissory note. It stands on the hollow stump of a belated Purchase and Assumption Agreement.

Plaintiff did not contract with Chase. WaMu assigned its rights as Lender to a third party two years before the OTS stepped in and FDIC took over. If Chase did not forward Plaintiff's payments to the Lender, Chase has been unjustly enriched.

The material allegations in the SAC present triable issues. A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the complaint's sufficiency. *North Star Int'l v. Arizona Corp. Comm'n,* 720 F.2d 578, 581 (9th Cir. 1983). All material allegations in the complaint, "even if doubtful in fact," are assumed to be true. The court must assume the truth of all factual allegations and must "construe them in a light most favorable to the nonmoving party." *Gompper v. VISX, Inc.,* 298 F.3d 893, 895 (9th Cir. 2002); *Walleri v. Fed. Home Loan Bank of Seattle*, 83 F.3d 1575, 1580 (9th Cir. 1996). The court must accept as true all reasonable inferences to be drawn from the material allegations in the complaint. *Barker v. Riverside County Office of Education*, 584 F.3d 821, 824 (9th Cir. 2009).

## 1. CAL CIVIL CODE §2923.5 – FIRST CAUSE OF ACTION

Defendant cites *Mabry v. Aurora Loan Services*, 185 Cal.App.4[th] 208 (2010) in support of the proposition that the NOD satisfies the requirements of Cal. Civil Code §2923.5 since it recites the form language of the statute. However, this misses the point of the statute. Section 2923.5 requires contact with the borrower, not form language stapled to a form. If the party sending the Notice attaches a declaration signed by a robo-signer who has no personal knowledge whether contacts were made, the NOD does not prove compliance with the notice requirements.

*Mabry* has been followed by various federal district courts in California. In *Das v. WMC Mortgage* Corp., 2010 U.S. Dist. LEXIS 122042, 10-25 (N.D. Cal. Oct. 28, 2010), the magistrate found that tender was not required, in contrast to Defendant's assertion that a borrower is required to make a tender offer (P&A 18-20).

> The whole purpose of this section (Cal. Civ. Code §2923.5) is to allow a homeowner an opportunity to at least discuss with the lender the possibility of loan modification. Where such communication does result in loan modification, the homeowner can avoid foreclosure even if he or she would not otherwise be in a position to fully "redeem" the property at a foreclosure sale. In situations like this, a requirement that the homeowner tender the entire amount of the secured indebtedness would actually defeat the purpose of the statute (p. 5-6).

1

2    In *Argueta v. Chase*, 2011 U.S. Dist. LEXIS 41300 (E.D. Cal. Apr. 11, 2011), the

3    District Court refused to grant a motion to dismiss where borrower alleged in the

4    Complaint that defendants did not contact him. The order states in part:

5        A notice of default may be filed only thirty days after the initial contact
6        with the borrower or satisfying the due diligence requirements. Civ. Code §
         2923.5(a)(1). A notice of default must be accompanied by a declaration stating
7        that the buyer has been contacted or could not be reached despite due
         diligence. Id. § 2923.5(b). The only remedy for violation of this statute is
8        postponement of a foreclosure sale until there has been compliance with the
9        statute. *Paik v. Wells Fargo Bank, N.A.*, No. C 10-04016, 2011 U.S. Dist.
         LEXIS 3979, 2011 WL 109482, at *3 (N.D. Cal. Jan. 13, 2011); *Mabry v.*
10       *Super. Ct.*, 185 Cal. App. 4th 208, 223, 110 Cal. Rptr. 3d 201 (4th Dist. 2010)
11       ("If section 2923.5 is not complied with, then there is no valid notice of
         default, and without a valid notice of default, a foreclosure sale cannot
12       proceed. The available, existing remedy is . . . to postpone the sale until there
13       has been compliance with section 2923.5.").
         Plaintiff alleges that all defendants failed "to assess the financial situation
14       and explore options for plaintiff to avoid foreclosure, thirty (30) days prior to
15       filing the Default." (Compl. ¶ 96.) Plaintiff allegedly received "no phone calls,
         phone messages, or letters via first class or certified mail either before or after
16       the Notice of Default was recorded." (Id. ¶ 100.)
17       While the moving defendants' provided the Notice of Default in which
         Quality Loan declares that it complied with the statute, the Complaint's
18       allegations to the contrary are sufficient to defeat a motion to dismiss. See
19       *Caravantes v. Cal. Reconveyance Co.*, No. 10-CV-1407, 2010 U.S. Dist.
         LEXIS 109842, 2010 WL 4055560, at *8 (S.D. Cal. Oct. 14, 2010).
20       Accordingly, the court will deny the motion to dismiss this claim.

21

22

23   Civ. Code § 2923.5 has been narrowly construed, but where the defendants failed

24   to access the financial situation and explore options, didn't call and didn't write, the

25   Complaint will defeat a motion to dismiss.

26   As an example of a 2923.5 declaration that makes sense in light of the language of

27   the statute, California Continuing Education for the Bar (CEB) recommends the

28   following form for a Notice of Default in its practice guide, *CEB Mortgages, Deeds of*

*Trust, and Foreclosure Litigation*, (4th ed. 2011):

DECLARATION UNDER CC §2923.5

I declare that:

I am _ _[the beneficiary/an authorized agent of the beneficiary]_ _ of the foregoing deed of trust. I initially attempted to contact the borrower (trustor under the deed of trust) by sending a first-class letter that included the toll-free telephone number made available by the United States Department of Housing and Urban Development (HUD) to find a HUD-certified housing counseling agency.

I contacted the borrower _ _[in person/by telephone]_ _ on _ _[date]_ _ to assess the borrower's financial situation and explore options for the borrower to avoid foreclosure. During the initial contact, I advised the borrower that he or she had the right to request a subsequent meeting and, if requested, that it would be scheduled within fourteen (14) days. The borrower _ _[did/did not]_ _ request the subsequent meeting. I also gave the borrower the toll-free telephone number made available by HUD to find a HUD-certified housing counseling agency.

I attempted to contact the borrower _ _[in person/by telephone]_ _ on the following dates _ _[list all dates of attempted contact and results of each attempt]_ _. This was done to assess the borrower's financial situation and explore options for the borrower to avoid foreclosure. I exercised due diligence to further contact the borrower as follows: _ _[list all actions taken to contact borrower and results as required by *CC §2923.5(g)*]_ _.

No contact with the borrower was required because the borrower surrendered the property on _ _[date]_ _ to the _ _[trustee/beneficiary/authorized agent]_ _, the borrower contracted with an organization, person, or entity whose primary business is advising how to extend the foreclosure process, or the borrower filed a bankruptcy petition and the bankruptcy court has not entered an order closing or dismissing the bankruptcy case or granting stay relief.

___[Signature of declarant]___<br>[Declarant's typed name]

Compare the above CEB form to CRC's cryptic, ambiguous, form-language §2923.5 declaration on the Notice of Default attached to the SAC as Exhibit 9:

The mortgagee, beneficiary or authorized agent tried with due diligence but was unable to contact the borrower to discuss the borrower's financial situation and to explore options for the borrower to avoid foreclosure as required by Cal. Civ. Code Section 2923.5. Thirty days or more have elapsed since these due diligence efforts were completed.

Cal. Civ. Code §2923.5(g) defines due diligence:

(g) A notice of default may be filed pursuant to Section 2924 when a mortgagee, beneficiary, or authorized agent has not contacted a borrower as required by paragraph (2) of subdivision (a) provided that the failure to contact the borrower occurred despite the due diligence of the mortgagee, beneficiary, or authorized agent. For purposes of this section, "due diligence" shall require and mean all of the following:

(1) A mortgagee, beneficiary, or authorized agent shall first attempt to contact a borrower by sending a first-class letter that includes the toll-free telephone number made available by HUD to find a HUD-certified housing counseling agency.

(2) (A) After the letter has been sent, the mortgagee, beneficiary, or authorized agent shall attempt to contact the borrower by telephone at least three times at different hours and on different days.  Telephone calls shall be made to the primary telephone number on file.

(B) A mortgagee, beneficiary, or authorized agent may attempt to contact a borrower using an automated system to dial borrowers, provided that, if the telephone call is answered, the call is connected to a live representative of the mortgagee, beneficiary, or authorized agent.

(C) A mortgagee, beneficiary, or authorized agent satisfies the telephone contact requirements of this paragraph if it determines, after attempting contact pursuant to this paragraph, that the borrower's primary telephone number and secondary telephone number or numbers on file, if any, have been disconnected.

(3) If the borrower does not respond within two weeks after the telephone call requirements of paragraph (2) have been satisfied, the mortgagee, beneficiary, or authorized agent shall then send a certified letter, with return receipt requested.

(4) The mortgagee, beneficiary, or authorized agent shall provide a means for the borrower to contact it in a timely manner, including a toll-free telephone number that will provide access to a live representative during business hours.

(5) The mortgagee, beneficiary, or authorized agent has posted a prominent link on the homepage of its Internet Web site, if any, to the following information:

(A) Options that may be available to borrowers who are unable to afford their mortgage payments and who wish to avoid foreclosure, and instructions to borrowers advising them on steps to take to explore those options.

(B) A list of financial documents borrowers should collect and be prepared to present to the mortgagee, beneficiary, or authorized agent when discussing options for avoiding foreclosure.

(C) A toll-free telephone number for borrowers who wish to discuss options for avoiding foreclosure with their mortgagee, beneficiary, or authorized agent.

(D) The toll-free telephone number made available by HUD to find a HUD-

certified housing counseling agency.

No evidence has been introduced to show that Chase or CRC used due diligence to contact Plaintiff. On the contrary, Chase ignored the request of Plaintiff's lawyer to explore options (Exhibit 6). The SAC alleges:

> 22. Chase did not contact Plaintiff or Mr. Banayan, either in person or by telephone, to discuss Plaintiff's financial condition and the impending foreclosure. Chase did not call, it did not write, and it did not provide a toll-free HUD number to Plaintiff or his lawyer. Chase did not offer to meet with Plaintiff or his lawyer and did not advise them that Plaintiff had a right to request a subsequent meeting within 14 days.

Attached to the NOD was a "Declaration of Compliance with Cal. Civ. Code §2923.5" signed under penalty of perjury by Renee Daniels for Chase. Ms. Daniels could not have had personal knowledge of the matters described in her declaration, which stated that the mortgagee, beneficiary or authorized agent was unable to contact the borrower to explore options to avoid foreclosure (SAC ¶ 26).

*Das v. WMC Mortgage* Corp., 2010 U.S. Dist. LEXIS 122042, 10-25 (N.D. Cal. Oct. 28, 2010) resolved a similar issue and refused to dismiss: The court may take judicial notice of the fact that the declaration signed by Natalie McClendon on April 18, 2009 was recorded. However, the court may not take notice of the content of the declaration because Defendants have not shown that Ms. McClendon is a source "whose accuracy cannot reasonably be questioned." See e.g., Reusser v. Wachovia Bank, N.A., 525 F.3d 855, 858 n. 3 (9th Cir. 2008); and Turnacliff v. Westly, 546 F.3d 1113, 1120 n. 5 (9th Cir. 2008). The fact that the declaration was recorded is not indisputable proof that Defendants actually contacted Plaintiffs to discuss their financial situation and the impending foreclosure. Further, courts may not take notice of any matter that is in dispute. U.S. v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003); Walker v. Woodford, 454 F. Supp. 2d 1007, 1022 (S.D.Cal. 2006).

California Attorney General Edmund G. Brown was so annoyed with Chase's

cavalier attitude towards §2923.5 that he wrote to Chase on September 30, 2010:

> "JP Morgan Chase has now admitted that employees assigned to handling foreclosures signed affidavits without first personally reviewing the contents of borrowers' loan files. Thus, borrowers suffered the foreclosure of their homes based on affidavits that JP Morgan Chase had not confirmed to be accurate. This admission strongly suggests that any purported verification by JP Morgan Chase that it complied with section 2923.5 before commencing a foreclosure in California is similarly suspect." (SAC Exhibit 3.)

- Attorney General Brown's letter to Chase, September 30, 2010

http://ag.ca.gov/cms_attachments/press/pdfs/n1996_jp_morgan_chase_letter.pdf

## 2. WRONGFUL FORECLOSURE – SECOND CAUSE OF ACTION

Chase offers no proof that it acquired an interest in Plaintiff's residence. In this Motion to Dismiss, once again the only document offered to support its claim is the P&A Agreement. Chase asks the court to leap to the conclusion that WaMu was the Lender on September 25, 2008, when the P&A Agreement was signed, even though the likelihood of that, given WaMu's history of securitization, is less than 50%. The challenge facing homeowners is to prove facts to trial courts at the pleading stage.

*Wall Street and the Financial Crisis - Anatomy of a Financial Collapse,* the U.S. Senate Permanent Subcommittee on Investigations (April 13, 2011) 650-page report, was released following an 18-month investigation into the causes of the financial crisis. WaMu was the leading case study in the report—183 pages (28%) of the report were devoted to WaMu—the worst of the worst. The report is readily available for download at the Senate Subcommittee's website. [2]

Over a four-year period, high-risk loans grew from 19% of WaMu's loan originations in 2003, to 55% in 2006, while its lower risk, fixed rate loans fell from 64% to 25% of its originations. At the same time, WaMu increased its

---

[2] http://levin.senate.gov/newsroom/supporting/2011/PSI_WallStreetCrisis_041311.pdf

securitization of subprime loans six fold, primarily through its subprime lender, Long Beach Mortgage Corporation, increasing such loans from nearly $4.5 billion in 2003, to $29 billion in 2006. From 2000 to 2007, WaMu and Long Beach together securitized at least *$77 billion* in subprime loans. WaMu originated an increasing number of its flagship product, Option Adjustable Rate Mortgages (Option ARMs), which created high risk, negatively amortizing mortgages and, from 2003 to 2007, represented as much as half of all of WaMu's loan originations. In 2006 alone, Washington Mutual originated more than $42.6 billion in Option ARM loans and sold or securitized at least $115 billion to investors.

— *Wall Street and the Financial Crisis*, page 2.

Chase knows whether Plaintiff's loan was on the books of WaMu on September 25, 2008, when Chase "acquired certain assets." If the property was not listed as an asset, then Chase did not acquire a beneficial interest in Plaintiff's loan and must show that it is acting as an authorized agent of the Lender, whomever that may be, in initiating foreclosure. If they don't know, they misappropriated Plaintiff's payments for an entire year and must make restitution.

Defendant alleges in its P&A, "JPMorgan obtained its rights under the loan from the FDIC" (P&A 4:5). Whether or not the Loan was an asset of WaMu on September 25, a key issue in this case, is not mentioned. Chase asks the court to find, without evidence, a fact that it must prove in order to take the property. Nothing in the P&A Agreement shows whether WaMu had any beneficial interest in Plaintiff's loan on September 25, 2008. The court is asked to guess the answer and dismiss the case. Then Plaintiff will lose his house.

Where factual findings or the contents of the documents are in dispute, those matters of dispute are not appropriate for judicial notice. *Caravantes v. California Reconveyance Co.*, 2010 WL 4055560, 9 (S.D.Cal. 2010) citing *Darensburg v.*

1 | *Metropolitan Transp. Comm'n*, 2006 WL 167657, at *2 (N.D.Cal. 2006).

2     WaMu sold its beneficial interest in Plaintiff's property to fund the loan,

3 receiving the balance on Plaintiff's note from the investors, and retained, if anything,

4 merely a duty to service the loan. Even if Chase acquired WaMu' servicing interests

5 on September 25, Chase acquired no beneficial interest in Plaintiff's loan.

6     There was a time, about ten ago, when servicers were trusted bankers. Times

7 have changed. Stated in the Congressional Oversight Panel's report at page 14:

> Effective transfers of real estate depend on parties being able to answer
> seemingly straightforward questions: who owns the property? How did they
> come to own it? Can anyone make a competing claim to it? The irregularities
> have the potential to make these seemingly simple questions complex. As a
> threshold matter, a party seeking to enforce the rights associated with the
> mortgage must have standing in court, meaning that a party must have an
> interest in the property sufficient that a court will hear their claim and can
> provide them with relief. *See* Stephen R. Buchenroth and Gretchen D. Jeffries,
> *Recent Foreclosure Cases: Lenders Beware* (June 2007); *Wells Fargo v.
> Jordan*, 914 N.E.2d 204 (Ohio 2009) ("If plaintiff has offered no evidence
> that it owned the note and mortgage when the complaint was filed, it would
> not be entitled to judgment as a matter of law."); Christopher Lewis Peterson,
> *Foreclosure, Subprime Mortgage Lending, and the Mortgage Electronic
> Registration System*, University of Cincinnati Law Review, Vol. 78, No. 4, at
> 1368-1371 (Summer 2010); *MERSCORP, Inc. v. Romaine*, 861 N.E. 2d 81
> (N.Y. 2006) (URL's redacted per local rule). Accordingly, a second set of
> problems relates to the chain of title on mortgages and the ability of the
> foreclosing party to prove that it has legal standing to foreclose. While these
> problems are not limited to the securitization market, they are especially acute
> for securitized loans because there are more complex chain of title issues
> involved.

    The investors who purchased the security identified as CUSIP # 31379XQC2 in Pool Number 432551 can make a competing claim to Plaintiff's property and the payments he made to Chase. Chase has offered no evidence that it owned the Note and Deed of Trust when the NOD and NOTS were filed, so it lacks standing.

    Chase argues that it obtained the right to sell Plaintiff's property when it acquired

WaMu's assets through the P&A Agreement for $1.9 billion. Chase could only acquire what WaMu owned. WaMu no longer owned Plaintiff' mortgage. Perhaps the identity of the Lender can be tracked down, but it remains unknown.

Defendant argues that Chase assumed no *liability* for actions taken by WaMu prior to September 25, 2008 in regard to the subject loan. This obscures the issue. Plaintiff alleges that WaMu did not have any interest in Plaintiff's residence on September 25, 2008. His property was not an asset of WaMu, and therefore Chase could not acquire any interest in Plaintiff's residence. This is not a liability issue.

Chase seems to assert that it can foreclose on any property under the P&A Agreement on the grounds that WaMu might have had a beneficial interest in the property at some time, even though WaMu sold most of its mortgages to investors.

Plaintiff alleges in ¶ 62 of the SAC that WaMu securitized Plaintiff's single-family residential mortgage loan through Washington Mutual Mortgage Securities Corp. If WaMu retained no beneficial interest in the promissory note when it brokered the deal, Chase cannot acquire what WaMu never had.

If WaMu transferred all of its beneficial interest in the note at the inception of the loan and never entered it in its books as an asset, and entered no corresponding reserve on its ledger as a liability in the event of Plaintiff's default, then Chase did not acquire ownership of the note by purchasing WaMu's assets because WaMu had nothing to sell. This is a question of fact. Plaintiff alleges in ¶ 30 of the SAC that Chase does not have standing to enforce the Note because Chase is not the owner of the Note, not a holder of the Note, and not a beneficiary under the Note.

If Chase has no beneficial interest in the note, Chase can only proceed if it proves that it is the servicer and joins the owner of the note in this action. To dismiss this lawsuit before ascertaining the truth of these allegations is unwarranted. Chase could produce evidence in its files, but it prefers to rob Plaintiff of his day in court.

In *Saxon Mortgage v. Hillery*, Case No. C-08-4357 (N.D. Cal. 2008), the court ruled that the foreclosing party must demonstrate that it is the holder of the deed of

trust and the promissory note. The *Saxon* court cited *In re Foreclosure Cases*, 521 F.Supp.2d 650, 653 (S.D. Ohio, 2007), which held that to show standing in a foreclosure action, the plaintiff must show that it is the holder of the note and the mortgage at the time the complaint was filed.

For a valid assignment, there must be more than just an assignment of the deed alone; the note must also be assigned.  "The note and mortgage are inseparable; the former as essential, the latter as an incident. An assignment of the note carries the mortgage with it, while an assignment of the latter alone is a nullity." *Carpenter v. Longan*, 83 U.S. 271, 274 (1872).

*In re Foreclosure Cases* involved 27 foreclosure actions filed in the Southern District of Ohio, in which the court questioned whether the plaintiff lenders had standing and whether the court had subject matter jurisdiction to hear the cases at the time the foreclosure complaint was filed. Judge Thomas M. Rose wrote, "It is the creditor's responsibility to keep a borrower and the Court informed as to who owns the note and mortgage and is servicing the loan, not the borrower's or the Court's responsibility to ferret out the truth." *In re Foreclosure Cases*, 521 F.Supp.2d 650, 652 (S.D. Ohio, 2007).

### 3. QUASI CONTRACT – THIRD CAUSE OF ACTION

Defendant argues that Plaintiff pleads no facts indicating that JPMorgan's receipt of payments from Plaintiff on the Subject Loan is unjust. The SAC alleges that when WaMu originated the loan, it transferred all beneficial interest in the note to an investment bank (SAC ¶ 28). Neither WaMu, Chicago Title, CRC, Chase, nor anyone else has recorded a transfer of a beneficial interest in the Note (or any other interest in the) Property to Chase. (SAC ¶ 29). Chase does not have standing to enforce the Note because Chase is not the owner of the Note, Chase is not a holder of the Note, and Chase is not a beneficiary under the Note. Chase does not have capacity to exercise a power of sale. Chase does not claim to be a holder of the note

1    or a beneficiary. Chase merely describes itself as a loan servicer in the Notice of

2    Trustee's Sale (SAC ¶30).

3        Implied contracts under Cal. Civ. Code §§1619 - 1621 refer to implied-in-fact

4    contracts that arise from the mutual agreement of the parties. *Iusi v. Chase,* 169 Cal.

5    App. 2d 83, 87, 337 P.2d 79 (1959). Courts recognize contracts called implied-by-

6    law contracts or quasi-contracts to prevent the unjust enrichment of one party, who

7    has no intent, either express or implied, to pay or to make reimbursement for

8    something of value received by that party. The law imposes an obligation to pay or

9    reimburse because good conscience dictates that the party benefited should make the

10    payment reimbursement. *Santa Clara County v. Robbiano,* 180 Cal. App. 2d 845,

11    848, 5 Cal. Rptr. 19 (1960); see *Halperin v. Raville*, 176 Cal. App. 3d 765, 774, 222

12    Cal. Rptr. 350 (1986)  (imposing liability to repay loan to family business on

13    equitable ground when no express promise was made).

14        The equitable doctrine of unjust enrichment applies where the plaintiff, while

15    having no enforceable contract, nonetheless has conferred a benefit on the defendant,

16    which the defendant has knowingly accepted in circumstances in which it would be

17    inequitable for the defendant to retain the benefit without paying for its value. The

18    phrase unjust enrichment does not describe a theory of recovery but describes the

19    effect that would result from a failure to make restitution in circumstances where it

20    is equitable to do so. Therefore, no particular form of pleading is necessary to invoke

21    the doctrine of restitution, and a well-pleaded claim for breach of contract can be

22    sufficient. While the measure of damages for unjust enrichment is essentially

23    restitution, that concept that has been expanded in modern jurisprudence to include,

24    not only the restoration of something, but also compensation, reimbursement,

25    indemnification, or reparation for benefits derived from, or for loss or injury caused

26    to, another. *Dunkin v. Boskey,* 82 Cal. App. 4th 171, 195 (2000).

27        It is not the receipt of payments that makes them unjust, but rather the unjust

28    retention of the payments coupled with repeated threats of foreclosure and eviction.

1   The elements of an unjust enrichment claim are the "receipt of a benefit and
2   [the] unjust retention of the benefit at the expense of another." *Lectrodryer v. Seoul*
3   *Bank,* 77 Cal.App.4th 723, 726 (2000). *Hirsch v. Bank of America,* 107 Cal.App.4th
4   708 (2003) held that the plaintiffs there "stated a valid cause of action for unjust
5   enrichment based on [the defendant's] unjustified charging and retention of
6   excessive fees" which were passed on to the plaintiffs. (Id. at p. 722.) Hirsch
7   involved plaintiffs who alleged they paid "overcharges" in the form of excessive
8   fees that were unjustly retained by the defendant at the plaintiffs' expense.

9   If Chase can show that it obtained "servicing interests" in Plaintiff's loan, then
10  perhaps Chase can also prove that it actually forwarded payments from Plaintiff to
11  the beneficial owner of the loan. If Chase kept the money, it was unjustly enriched at
12  Plaintiff's expense.

13  Defendant cites *Melchior v. New Line Productions*, 106 Cal.App.4th 779 (2003)
14  for the proposition that unjust enrichment is not a cause of action. Unjust enrichment
15  would be the result if Chase is not the Lender and it were to retain the payments, but
16  the Third Cause of Action is brought under a theory of Quasi Contract. Melchior
17  was a screenwriter who alleged that defendants converted his script to produce an
18  episode of the Columbo television series. The court wrote, "The phrase 'Unjust
19  Enrichment' does not describe a theory of recovery, but an effect: the result of a
20  failure to make restitution under circumstances where it is equitable to do so
21  (citation). Unjust enrichment is a general principle, underlying various legal
22  doctrines and remedies, rather than a remedy itself. (citing Dinosaur Development,
23  Inc. v. White (1989) 216 Cal.App.3d 1310, 1315, 265 Cal.Rptr. 525.) It is
24  synonymous with restitution.  The court continues, "Melchior suggests he is entitled
25  to restitution under a quasi-contract theory. He did not plead this theory of recovery,
26  and he points to nothing in the record that suggests it was before the trial court in
27  ruling on the summary judgment motion. It consequently cannot serve as a basis for
28  reversing the summary judgment." 106 Cal.App.4th 779, 793. So the Melchior court

1   recognized quasi contract as a valid theory of recovery which had not been pled.

2

3   ## 4. NO CONTRACT – FOURTH CAUSE OF ACTION

4   Contracts are not formed every time two people shake hands, or exchange things

5   of value, or talk about how they expect things to turn out. If a trader sells a diseased

6   camel to an unsuspecting buyer on a promise to pay over time and the camel dies the

7   following day, there is no contract. They buyer doesn't have to pay.

8   No contract was formed between WaMu and Plaintiff because there was no

9   meeting of the minds and no shared expectation. A contract is not simply words on

10  paper. WaMu did not disclose to Plaintiff that it committed underwriting fraud by

11  altering Plaintiff's loan application to satisfy underwriting requirements for the

12  loans. WaMu's intent was evidenced by WaMu's failure to provide Plaintiff with

13  copies of documents as required by Section 17 of the Deed of Trust and provisions

14  of TILA. WaMu did not inform Plaintiff that his loan had already been sold to

15  investors and that WaMu would not have any beneficial interest in the loan.

16  Chase asserts that the one-year Statute of Limitations has expired, but the failure

17  of WaMu to provide documents at closing, a clear violation of federal law, serves a

18  different evidentiary purpose. It shows motive. WaMu didn't fund the mortgage

19  from its own assets, but rather brokered the loan with funds provided by institutional

20  investors. WaMu did not provide the borrower with a copy of the loan application

21  because it didn't want to alert the borrower to the fact that it was pooling toxic waste

22  for unsuspecting investors. This is not a question of whether Chase assumed a

23  liability in the P&A Agreement with FDIC. It shows that Plaintiff and WaMu never

24  came to a mutual understanding.

25  Some decisions have suggested that lenders do not have a duty to ascertain the

26  ability of borrowers to repay home loans. If lenders have no duty to weigh the

27  likelihood that borrowers can demonstrate even a remote ability to repay bank loans,

28  then our time-tested system governing transfers of interest in real estate is

1   collapsing. Title companies are beginning to refuse to guarantee title.

2       Evaporation of the duty of the lender to follow commonly accepted underwriting

3   practices resulted in the current economic crisis. It was not just that banks didn't care

4   if the homeowners could pay back their loans that crippled our economy. They made

5   loans knowing that the borrowers could never possibly pay them back. If one party

6   enters into an agreement knowing full well that the other party will default, there is

7   no contract. It is not a question of duty or liability. There is no contract because there

8   is no shared expectation. It is *void ab initio*.

9       At the same time that WaMu was implementing its high risk lending
strategy, WaMu and Long Beach engaged in a host of shoddy lending
10  practices that produced billions of dollars in high risk, poor quality mortgages
and mortgage backed securities. Those practices included qualifying high risk
11  borrowers for larger loans than they could afford; steering borrowers from
conventional mortgages to higher risk loan products; accepting loan
12  applications without verifying the borrower's income; using loans with low,
short term "teaser" rates that could lead to payment shock when higher
13  interest rates took effect later on; promoting negatively amortizing loans in
which many borrowers increased rather than paid down their debt; and
14  authorizing loans with multiple layers of risk. In addition, WaMu and Long
Beach failed to enforce compliance with their own lending standards; allowed
15  excessive loan error and exception rates; exercised weak oversight over the
third party mortgage brokers who supplied half or more of their loans; and
16  tolerated the issuance of loans with fraudulent or erroneous borrower
information. They also designed compensation incentives that rewarded loan
17  personnel for issuing a large volume of higher risk loans, valuing speed and
volume over loan quality.
18      As a result, WaMu, and particularly its Long Beach subsidiary, became
known by industry insiders for its failed mortgages and poorly performing
19  residential mortgage backed securities (RMBS). Among sophisticated
investors, its securitizations were understood to be some of the worst
20  performing in the marketplace.
    Documents obtained by the Subcommittee reveal that WaMu launched its
21  high risk lending strategy primarily because higher risk loans and mortgage-
backed securities could be sold for higher prices on Wall Street. They
22  garnered higher prices because higher risk meant the securities paid a higher
coupon rate than other comparably rated securities, and investors paid a higher

price to buy them. Selling or securitizing the loans also removed them from WaMu's books and appeared to insulate the bank from risk.
—*Wall Street and the Financial Crisis - Anatomy of a Financial Collapse,* the U.S. Senate Permanent Subcommittee on Investigations (April 13, 2011)p. 2-4

Meeting of the minds is a necessary element in the formation of a contract, a notion that dates back to the origins of contract law. Consent of the parties is one of the requisites of a valid contract for the sale of realty. *Ussery v. Jackson*, 78 Cal. App. 2d 355 (1947). It is essential to the creation of such a contract that there be a meeting of the minds of the parties and a mutual agreement on the terms of the contract. *Holland v. McCarthy*, 173 Cal. 597 (1916); *German Sav. & Loan Soc. v. McLellan*, 154 Cal. 710 (1908); *Lonergan v. Scolnick*, 129 Cal. App. 2d 179 (1954); *Cook v. Mielke*, 3 Cal. App. 2d 736 (1935).

The writing must evince a free and mutual understanding of the parties and show that they both agreed on the same thing in the same sense, *Estes v. Hardesty*, 66 Cal. App. 2d 747 (1944), or the writing has no binding effect on either. *Patterson v. Clifford F. Reid, Inc.*, 132 Cal. App. 454 (1933); *Scott v. Los Angeles Mountain Park Co.*, 92 Cal. App. 258 (1928). When the writing shows that there was no meeting of the minds on the material terms of the proposed agreement, no contract exists, no obligation to convey rests on the vendor, and the purchaser is under no duty to accept the property or pay for it. *Burgess v. Rodom*, 121 Cal. App. 2d 71 (1953); *Salomon v. Cooper*, 98 Cal. App. 2d 521 (1950). In such a case it is immaterial that the signature of the party charged, or of both parties, is affixed. *Patterson v. Clifford F. Reid, Inc.,* 132 Cal. App. 454 (1933); *Morton v. Foss,* 48 Cal. App. 2d 117 (1941).

It is indispensable to a valid memorandum of an agreement to sell and convey land that it be complete evidence of the terms to which the parties have assented. If it establishes that there was in fact no contract, if it discloses that upon essential and material terms the minds of the parties did not meet and that such terms were left

open for future settlement, then there is no binding obligation upon the seller to convey or the buyer to accept and pay for the land. It will be regarded as merely an inchoate effort. Implications will not be indulged. *Salomon v. Cooper*, 98 Cal.App.2d 521, 522-523 (1950).

An action for damages for breach of contract for the purchase or sale of real property will not lie unless the writing contains the essential terms and material elements of such an agreement without recourse to parole evidence of the intention of the contracting parties. *Dillingham v. Dahlgren*, 52 Cal.App. 322, 326-327 (1921). "Plaintiff's evidence does not establish the indispensable 'meeting of the minds' regarding the material terms of this transaction and, therefore, the existence of an enforceable contract." *Martin Deli v. Schumacher*, 52 N.Y.2d 105, 109, 436 N.Y.S.2d 247, 417 N.E.2d 541 (1981).

David Horton wrote in the UCLA Law Review, "The perception that adherents (to standard form contracts) did not read and could not understand fine-print terms made it difficult to identify the requisite 'meeting of the minds' or 'mutual assent' of contract formation." David Horton, "The Shadow Terms: Contract Procedure and Unilateral Amendments," 57 UCLA Law Review 605 (February, 2010).

William R. Hubbard wrote, "(T)he core of a contract is the parties' *meeting of the minds*, which both parties will want to memorialize clearly. If a dispute arises regarding the meaning of a contract term, both parties can provide evidence regarding the *meeting of the minds*. William Hubbard, "Efficient Definition and Communication of Patent Rights: the Importance of Ex Post, Santa Clara Computer and High Technology Law Journal (January, 2009).

## 5. QUIET TITLE – FIFTH CAUSE OF ACTION

Defendant argues that tender of the full amount of the debt is necessary, citing *Nool, Pagtalunan, Miller*, and *Caravantes*. However, if Chase has no enforceable claim to the Property, and cannot produce any evidence that it acquired or possesses

1  any rights to the property, then full tender would be an onerous requirement to stop
2  their frivolous claim. Any crook could file a Notice of Trustee's Sale and evict a
3  homeowner. If lack of resources prevented the homeowner from having his day in
4  court, how would he prove that the thief had an illegitimate claim? *Mabry* states that
5  a requirement of tender would defeat the purpose of Civ. Code §2923.5. *Mabry v.*
6  *Aurora Loan Services*, 185 Cal.App.4[th] 208 (2010). The same principle applies
7  where the foreclosing party can offer no evidence that it is authorized to foreclose.

8  The core issue in this case is to ascertain who is the Lender. Plaintiff did not
9  borrow money from Chase. Plaintiff's pre-discovery inquiries indicate that WaMu
10 did not own the loan on September 25, 2008, and therefore Chase is not the Lender.
11 This issue cannot be brushed aside because California is a non-judicial state.

12 In California, an obligation arises either from the contract of the parties or by
13 operation of law. Cal. Civ. Code §1428; Cal. Code Civ. Proc. §26. A mortgage is a
14 contract. Cal. Civ. Code §2920(a). A power of sale is conferred on the mortgagee,
15 trustee, or other person *by the mortgage*. Cal. Civ. Code §2924.

16 The Adjustable Rate Note attached to the SAC as Exhibit 3 identifies
17 Washington Mutual Bank as the Lender in ¶ 1, which then says, "Lender or anyone
18 who takes this Note by transfer and who is entitled to receive payments under this
19 Note is called the "Note Holder."

20 The Note states in ¶ 7(C): "Notice of Default. If I am in default, the Note Holder
21 may send me a written notice telling me that if I do not pay the overdue amount by a
22 certain date, the Note Holder may require me to pay immediately the full amount…"

23 So the Note gives the right to collect, if timely payments are not made, to the
24 Lender and anyone who takes the Note by transfer. This does not include a servicer
25 who is not the holder of the Note.

26 In Plaintiff's Deed of Trust (SAC Exhibit 4) **t**he "Lender" is WASHINGTON
27 MUTUAL BANK, FA (page 1, ¶ C). The "Trustee" is CHICAGO TITLE
28 COMPANY (page 2, ¶ D).

Plaintiff's Opposition to Motion to Dismiss Second Amended Complaint

1     Consistent with the Note, only the Lender is authorized under ¶ 22 of the DOT
2  to accelerate the loan:

3          "Lender shall give notice to Borrower prior to acceleration following
4          Borrower's breach of any covenant of agreement in this Security
5          Instrument…
6          "If Lender invokes the power of sale, Lender shall execute or cause
7          Trustee to execute a written notice of the occurrence of an event of
8          default and of Lender's election to cause the Property to be sold. Trustee
9          shall cause this notice to be recorded in each county in which any part of
10         the Property is located." (DOT page 13, ¶ 22).

11    Washington Mutual Bank remained the Lender for no more than a few days until
12  it sold the loan. Thereafter, it was, at best, a servicer of the loan. The Lender was the
13  investment trust that put up the money.

14    Foreclosure of the Wellworth Property was commenced by CRC, having been
15  appointed trustee on April 30, 2010, by Chase. Chase was not the Lender. The DOT
16  (SAC Exhibit 4) states on page 13, paragraph 24:

17         "Lender, at its option, may from time to time appoint a successor Trustee
18         to any Trustee appointed hereunder by an instrument executed and
19         acknowledged by Lender and recorded in the office of the Recorder of the
20         county in which the Property is located." (SAC Exhibit 8, ¶24).

21    Defendant asks the Court's approval to proceed with foreclosure of Plaintiff's
22  property on the basis of a NOD and NOTS filed by CRC, a wholly owned subsidary
23  of Chase (SAC ¶16) that was appointed as successor Trustee by Chase even though
24  Chase is not the Lender and has not revealed who the Lender might possibly be.

25    Defendant cites Cal. Civ. Code §2934 for the proposition that an assignment of a
26  deed of trust is not required to be recorded in order to provide constructive notice of
27  the contents of the deed of trust. (P&A 6:11-14).  That section actually says: "Any
28  assignment of a mortgage and any assignment of the beneficial interest under a deed

of trust may be recorded, and from the time the same is filed for record operates as constructive notice of the contents thereof to all persons;" The case cited by Defendant, *Santens v. Los Angeles Finance Co.*, 91 Cal.Ap.2d 197, 201 (1949) was concerned with whether a bona fide purchaser at an execution sale was bound by an assignment of the note if the deed of trust was not recorded.

Cal. Civ. Code §2934a provides:

(a) (1) The trustee under a trust deed upon real property or an estate for years therein given to secure an obligation to pay money and conferring no other duties upon the trustee than those which are incidental to the exercise of the power of sale therein conferred, may be substituted by the recording in the county in which the property is located of a substitution executed and acknowledged by:

(A) all of the beneficiaries under the trust deed, or their successors in interest…

Nowhere does the Civil Code allow for assignment of a Deed of Trust by the assignee acting on its own behalf.

Since Chase is not the Lender, it would violate the terms of the Note and the Deed of Trust to dismiss the SAC and allow Chase to foreclose as a result of a forged Assignment of Deed of Trust signed by someone working for the Assignee.

Plaintiff holds a grant deed. Chase has a contested Purchase and Assumption Agreement that has generated millions of dollars in lawyers' fees every month.

Plaintiff is ready, willing and able to resume monthly payments to the owner of the note, but is Chase legally entitled to receive these funds from Plaintiff? Chase must show that it is the beneficiary of the note, or that it is acting on behalf of the beneficiary with the beneficiary's blessing. Plaintiff is informed and believes that Chase cannot produce the necessary instruments. Plaintiff will show at trial that the promissory note was bundled into a presold "Trust" which was then pooled and sold to investors many times over. The note was separated from the deed of trust and atomized. It no longer exists as an enforceable mortgage document.

Multiple banks may attempt to foreclose upon the same property. Borrowers who have already suffered foreclosure may seek to regain title to their homes and force any new owners to move out. Would-be buyers and sellers could find themselves in limbo, unable to know with any certainty whether they can safely buy or sell a home. If such problems were to arise on a large scale, the housing market could experience even greater disruptions than have already occurred, resulting in significant harm to major financial institutions. For example, if a Wall Street bank were to discover that, due to shoddily executed paperwork, it still owns millions of defaulted mortgages that it thought it sold off years ago, it could face billions of dollars in unexpected losses. (COP Report, p. 4-5)

## 6. DECLARATORY/INJUNCTIVE RELIEF – SIXTH CAUSE OF ACTION

Plaintiff's home was scheduled by CRC to be sold on the Courthouse steps on November 8, 2010. A Trustee's Sale of Plaintiff's home is currently scheduled for June 10, 2011. There is a significant and grueling controversy brewing between the parties and a pressing need for a judicial determination of the parties' rights and duties concerning the validity of the Promissory Note and Deed of Trust.

Plaintiff requests a Temporary Restraining Order and Preliminary Injunction restraining defendant from conducting a Trustee's Sale of the Property during the pendency of this action.

## 7. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS – SEVENTH CAUSE OF ACTION

"An assertion of legal rights based on one's own economic interests does not qualify as 'outrageous' under this standard" argues defendant, citing *Trerice v. Blue Cross,* 209 Cal.App3d 878, 883 (1989).

Times have changed since 1989. The mortgage meltdown in the past decade was outrageous, devastating, and extremely distressful for the millions of families who lost their homes. To Chase it may seem to be business-as-usual, but Defendant's conduct as alleged in the SAC was so outrageous that it exceeded all bounds

tolerated in a civilized society—forged documents, systemic perjury, underwriting fraud, selling worthless junk to unsuspecting retirement funds, and attempting to take a family's home without any legal claim to the property.

Defendant concludes by citing *Kruse v. Bank of America*, 202 Cal.App.3d 38, 67 (1988), which states there is no claim for intentional infliction of emotional distress where the lender simply attempted to collect a debt due under a security interest. That depends on whether the interloper is the Lender, and that is why Defendant's motion to dismiss must be denied.

> **Public Faith in Due Process Could Suffer.** If the public gains the impression that the government is providing concessions to large banks in order to ensure the smooth processing of foreclosures, the people's fundamental faith in due process could suffer (COP Report, p. 84).

## 8. CONCLUSION

For the foregoing reasons, Plaintiff Daryoush Javaheri respectfully requests that the Court deny Defendant's Motion to Dismiss. If any claims are insufficiently plead, Plaintiff requests leave to amend. Where a motion to dismiss is granted, a district court should provide leave to amend unless it is clear that the Complaint could not be saved by any amendment. *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). The Ninth Circuit requires that this policy favoring amendment be applied with extreme liberality." *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990).

Date: May 16, 2011                    /s/_____

                                      DOUGLAS GILLIES
                                      Attorney for Plaintiff
                                      DARYOUSH JAVAHERI

Plaintiff's Opposition to Motion to Dismiss Second Amended Complaint